UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

PAUL CAMPO and ROBERT SENSI,

Defendants.

SEALED INDICTMENT

25 Cr.

25 CRIM 663

## COUNT ONE
### (Narco-Terrorism Conspiracy)

The Grand Jury charges:

OVERVIEW

1. From at least in or about December 2024, up through and including at least in or about November 2025, PAUL CAMPO and ROBERT SENSI, the defendants, and others known and unknown, participated in a scheme to launder money and traffic drugs for the Jalisco New Generation Cartel, a/k/a Cartel de Jalisco Nueva Generacion or CJNG ("CJNG"), a Foreign Terrorist Organization designated by the U.S. Department of State. As part of that scheme, CAMPO and SENSI agreed to launder approximately $12,000,000 dollars of narcotics proceeds for CJNG; laundered approximately $750,000 by converting cash into cryptocurrency; and provided a payment for approximately 220 kilograms of cocaine on the understanding that the cocaine had been imported into the United States. CAMPO and SENSI further advised a supposed CJNG member about fentanyl production and explored procuring firearms and explosive devices for CJNG. As part of these discussions, CAMPO and SENSI often boasted about and relied heavily on the experience and supposed expertise of CAMPO, a former high-level federal law enforcement officer with the Drug Enforcement Administration ("DEA").

## BACKGROUND

2. PAUL CAMPO, the defendant, worked for the DEA for approximately 25 years, first as a Special Agent in New York and eventually rising to become a high-level DEA official, specifically the Deputy Chief of the Office of Financial Operations. CAMPO retired from DEA in or about January 2016. Currently, CAMPO runs a private consulting business.

3. ROBERT SENSI, the defendant, is an associate of CAMPO.

4. Beginning in late 2024, PAUL CAMPO and ROBERT SENSI, the defendants, met with a confidential source working at the direction of law enforcement ("CS-1"), who was posing as a member of CJNG.

5. CJNG is a Mexico-based transnational criminal group that controls a significant portion of the narcotics trafficking trade. Formed in or about 2011 from the remnants of the Milenio Cartel, which was affiliated with the Sinaloa Cartel, CJNG has a presence in dozens of countries, including the United States. The cartel maintains its vast drug trade through violence, bribery of corrupt officials, and a franchise-based command structure. CJNG is overseen by Nemesio Ruben "El Mencho" Oseguera-Cervantes and a small group of top-tier commanders who report directly to El Mencho. A second tier of bosses operates under the top tier leaders. The franchise model permits each semi-independent group to customize its operations according to specific areas of expertise (for example, running clandestine methamphetamine labs) or market demands, provided it complies with naming, branding, and organizational structure requirements and follows the general direction of CJNG leaders. Because new franchises are easy to establish, the franchise model enables CJNG to expand quickly. CJNG also maximizes its revenue through this model, because leadership does not pay the operating costs of its franchises but does collect a percentage of overall profits. CJNG obtains methamphetamine and fentanyl precursor chemical

shipments from China and cocaine shipments from South America. CJNG illicitly transports cocaine, methamphetamine, fentanyl, and other controlled substances into the United States. CJNG also engages in money laundering, bribery, extortion of migrants, taxing of migrant smugglers, and other criminal activities, including acts of violence and intimidation. On February 20, 2025, the United States Secretary of State designated CJNG as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act.[1]

6. The relationship between PAUL CAMPO and ROBERT SENSI, the defendants, and CS-1 began in or about December 2024. Over a series of initial meetings and conversations, SENSI and CS-1 discussed, in substance and in part, that SENSI was friends with CAMPO. SENSI told CS-1 that CAMPO used to be in charge of DEA's financial operations and claimed that CAMPO still had connections to DEA, including its top leadership. SENSI represented, in substance and in part, that CAMPO could launder narcotics proceeds and claimed that CAMPO could provide CS-1 with sensitive DEA information about sources and investigations.

7. After these initial meetings, PAUL CAMPO and ROBERT SENSI, the defendants, together met with CS-1 to discuss money laundering, drug trafficking, drug manufacturing, and the procurement of firearms and explosive devices for the CJNG. During these conversations, CAMPO and SENSI agreed to launder money for CS-1 by, among other things, converting cash into cryptocurrency and making investments in real estate. CAMPO and SENSI also agreed to explore procuring commercial drones and military-grade weapons and equipment for CJNG, including AR-15 semi-automatic rifles, M4 carbines, M16 rifles, grenade launchers, and rocket

---

[1] On February 20, 2025, the Secretary of State also designated CJNG as a Specially Designated Global Terrorist under Executive Order 13224. The Secretary of State has also listed the following aliases for Cartel de Jalisco Nueva Generacion: New Generation Cartel of Jalisco, CJNG, and Jalisco New Generation Cartel. To date, CJNG remains a designated FTO.

3

propelled grenades. Regarding the drones, in one meeting, CS-1 explained to CAMPO, "what we do with the drones, we put explosives and we just send it over there, boom"; in another conversation, CS-1 asked SENSI how much C-4 explosive the drones could carry, to which SENSI responded, in sum and substance, approximately six kilograms, which is enough to "blow up the whole fucking . . . I don't want to say."

8.  In connection with these discussions with CS-1, CAMPO, SENSI, and their co-conspirators have laundered funds on three occasions, totaling $750,000, by converting cash into cryptocurrency and returning it to CS-1 and others. The first two times, CS-1 represented these funds to be proceeds of narcotics trafficking activity. The final time, CAMPO and SENSI agreed to directly participate in a purported narcotics transaction, in which they converted cash into cryptocurrency, which they understood would trigger the distribution of approximately 220 kilograms of cocaine worth approximately $5,000,000, for which CAMPO and SENSI would (i) receive directly a portion of the narcotics proceeds as profit; and (ii) receive a further commission upon the laundering of the balance of the narcotics proceeds. CAMPO and SENSI have further agreed to launder up to at least $12,000,000 of CJNG narcotics proceeds.

## THE MONEY LAUNDERING

9.  In or about March 2025, CS-1 met with PAUL CAMPO and ROBERT SENSI, the defendants, twice: once at a restaurant in Manhattan, New York (the "New York Meeting") and a second time at a hotel in Tampa, Florida (the "Tampa Meeting").

   a.  During the New York Meeting, which occurred on or about March 10, 2025, CS-1 described, in substance and in part, that CJNG had operations across the United States and that CS-1 needed a reliable method of moving money from the United States to Mexico.

   b.  During the New York Meeting, CAMPO discussed a variety of methods for

4

concealing and laundering CJNG's drug trafficking proceeds, including investing in real estate, using pre-paid cards, converting the proceeds to cryptocurrency, and bulk cash smuggling. CAMPO also referenced several other "projects" that he was working on for clients involving millions of dollars and stated, in substance and in part, that he had been hired by others like the head of CJNG to "get their money back."

    c.  Ultimately, CAMPO, SENSI, and CS-1 agreed that, in order to build trust, CS-1 would provide CAMPO and SENSI with several smaller installments of cash from CJNG's operations in North Carolina and CAMPO would convert the cash into cryptocurrency and return it to CS-1. CAMPO and SENSI agreed that they would charge CS-1 no more than 8% for this service.

    d.  During the New York Meeting, CS-1 asked CAMPO in substance and in part, how CS-1 could be sure that CAMPO would not arrest CS-1, and CAMPO replied that CS-1 could not be sure of that. CAMPO, however, explained that he has been retired for many years and now does consulting. CAMPO later showed CS-1 his DEA badge that indicated that he is retired from DEA.

    e.  During the Tampa Meeting, which occurred on or about March 26, 2025, CAMPO and SENSI agreed to launder up to $12,000,000 of CJNG's drug trafficking proceeds. As part of this discussion, CAMPO proposed, in substance and in part, investing the funds in real estate and investment vehicles, in order to preserve the assets and receive a return. CAMPO, SENSI, and CS-1 also further discussed the initial delivery of narcotics proceeds for CAMPO and SENSI to launder into cryptocurrency. CAMPO, SENSI, and CS-1 agreed that the initial transaction would total approximately $200,000 and SENSI would pick up the money in Charlotte, North Carolina (the "First Money Pickup").

5

f. During the Tampa Meeting, CAMPO and CS-1 explicitly discussed the fentanyl production and distribution operations of CJNG. At one point, CAMPO remarked that he could be a "strategist" for CS-1's organization. CAMPO suggested, in substance and in part, that CS-1's organization should create the perception that they are moving fentanyl operations from Mexico to Colombia to divert attention from Mexico.

10. On or about June 3, 2025, CS-1 met with ROBERT SENSI, the defendant, in Charlotte, North Carolina to execute the First Money Pickup. CS-1 delivered $200,000 cash to SENSI to be converted into cryptocurrency and returned to CS-1. When the two parted, CS-1 remarked to SENSI, "Welcome to the fucking cartel."

11. On or about June 6 and June 7, 2025, PAUL CAMPO and ROBERT SENSI, the defendants, and their co-conspirators sent several transfers of cryptocurrency totaling approximately $187,000—that is, $200,000 less CAMPO and SENSI's fee—to a cryptocurrency wallet that CS-1 represented belonged to CJNG, but which in actuality was controlled by DEA. For each transfer, SENSI sent CS-1 a screenshot showing that the transfer had been initiated.

12. On or about July 16, 2025, PAUL CAMPO and ROBERT SENSI, the defendants, and CS-1 met at a restaurant in Manhattan, New York (the "Second New York Meeting"), during which they discussed, in substance and in part, laundering additional narcotics proceeds, specifically $12,000,000. During the Second New York Meeting, CAMPO also told CS-1 that if CS-1 imported cocaine into the United States, CS-1 could be charged with a federal crime, regardless of whether cocaine is legal in the country from where it is shipped.

13. On or about September 17, 2025, PAUL CAMPO and ROBERT SENSI, the defendants, and CS-1 communicated via encrypted messaging to discuss the next delivery of narcotics proceeds for CAMPO and SENSI to launder. In sum and substance, CAMPO and SENSI

agreed that SENSI would meet CS-1 on or about September 23, 2025 at the same location in Charlotte, North Carolina where they met for the initial delivery on or about June 3, 2025 (the "Second Money Pickup").

14. On or about September 23, 2025, CS-1 met with ROBERT SENSI, the defendant, in Charlotte, North Carolina to deliver additional proceeds for SENSI and PAUL CAMPO, the defendant, to launder. Specifically, CS-1 delivered $300,000 cash in DEA funds to SENSI to be converted into cryptocurrency and returned to CS-1. SENSI placed the money in a black backpack and proceeded to meet with up with CAMPO and other co-conspirators at a hotel in Charlotte, North Carolina.

15. On or about September 29, 2025, PAUL CAMPO and ROBERT SENSI, the defendants, and their co-conspirators sent cryptocurrency totaling approximately $276,000—that is, $300,000 less CAMPO and SENSI's fee—to a cryptocurrency wallet that CS-1 represented belonged to CJNG, but which in actuality was controlled by DEA.

## THE NARCOTICS TRANSACTION

16. On or about October 1, 2025, CS-1 met with ROBERT SENSI, the defendant, in Boca Raton, Florida. During the meeting, CS-1 offered SENSI the opportunity for SENSI and PAUL CAMPO, the defendant, to participate in a narcotics deal orchestrated by CS-1.

    a. Specifically, CS-1 told SENSI, in substance and in part, that a shipment of over 220 kilograms of cocaine was coming to the United States and CS-1 wanted to purchase the narcotics from the owner in order to increase CS-1's standing within CJNG. If they wanted to participate, CAMPO and SENSI would have to convert CS-1's cash into cryptocurrency and deliver it to the owner of the cocaine, who would then release the shipment to CS-1. At that point, CS-1 indicated, in substance and in part, that CS-1 would sell the narcotics for approximately

7

$5,000,000 and pay CAMPO and SENSI thirty percent of the proceeds (totaling approximately $1,500,000) and the rest would be delivered to CAMPO and SENSI to invest in various opportunities for CS-1. CAMPO and SENSI would also receive a ten percent fee for converting the cash into cryptocurrency.

        b.      After CS-1 relayed this proposal to SENSI, CS-1 and SENSI called CAMPO. CS-1 described the same proposal to CAMPO and stated, in substance and in part, that the shipment was scheduled to arrive in the next two weeks. CAMPO emphasized, in substance and in part, that if CAMPO and SENSI converted the cash into cryptocurrency, but CS-1 did not deliver the $5,000,000, CAMPO and SENSI would no longer work with CS-1. However, if CS-1 delivered both parts of the deal, CAMPO and SENSI would establish a long-term working relationship with CS-1. With that understanding, CAMPO and SENSI agreed to participate in this transaction.

        17.      On or about October 16, 2025, CS-1 met with ROBERT SENSI, the defendant, in Manhattan, New York and delivered $250,000 cash to be converted into cryptocurrency for the narcotics transaction. CS-1 directed SENSI to send the cryptocurrency to the owner of the cocaine they were purchasing. On or about October 17 and 18, 2025, PAUL CAMPO, the defendant, SENSI, and their co-conspirators sent several transfers of cryptocurrency totaling approximately $225,000—that is, $250,000 less CAMPO and SENSI's fee—to a cryptocurrency wallet controlled by the Internal Revenue Service, but represented by CS-1 to belong to the owner of the cocaine. Upon the wallet's receipt of these funds, CS-1 informed CAMPO and SENSI, via encrypted messaging, that the owner confirmed receipt and was releasing the product. CS-1 wrote, "Wow brothers!! Taking possession of the product NOW!!!" and "Now we have to deliver and start collecting the paper brother!!!!" In response, CAMPO wrote, in sum and substance, that SENSI

8

could meet with CS-1 as soon as needed.

## STATUTORY ALLEGATIONS

18. From at least in or about December 2024, up to and including in or about November 2025, in the Southern District New York and elsewhere, PAUL CAMPO and ROBERT SENSI, the defendants, and others known and unknown, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to violate Title 21, United States Code, Section 960a.

19. It was a part and an object of the conspiracy that PAUL CAMPO and ROBERT SENSI, the defendants, and others known and unknown, would and did engage in conduct that would be punishable under Title 21, United States Code, Section 841(a) if committed within the jurisdiction of the United States, to wit, the distribution of, and possession with the intent to distribute, five kilograms and more of mixtures and substances containing a detectable amount of cocaine, knowing and intending to provide, directly and indirectly, something of pecuniary value to a person and organization that has engaged and engages in terrorist activity (as defined in Title 8, United States Code, Section 1182(a)(3)(B)) or terrorism (as defined in Title 22, United States Code, Section 2656f(d)(2)), to wit, CJNG and its members, operatives, and associates, having knowledge that such organization and persons have engaged and engage in terrorist activity and terrorism, in violation of Title 21, United States Code, Section 960a.

(Title 21, United States Code, Section 960a.)

## COUNT TWO
**(Conspiracy to Distribute Narcotics)**

The Grand Jury further charges:

20. The allegations contained in paragraphs 1 through 19 of this Indictment are repeated and realleged as if fully set forth herein.

9

21. In or about October 2025, in the Southern District of New York and elsewhere, PAUL CAMPO and ROBERT SENSI, the defendants, and others known and unknown, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to violate the controlled-substance laws of the United States.

22. It was a part and an object of the conspiracy that PAUL CAMPO and ROBERT SENSI, the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

23. The controlled substance involved in the offense was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

## COUNT THREE
**(Conspiracy to Provide Material Support and Resources to CJNG)**

The Grand Jury further charges:

24. The allegations contained in paragraphs 1 through 23 of this Indictment are repeated and realleged as if fully set forth herein.

25. From at least in or about March 2025, up to and including in or about November 2025, in the Southern District New York and elsewhere, PAUL CAMPO and ROBERT SENSI, the defendants, and others known and unknown, knowingly and intentionally combined, conspired, confederated, and agreed together and with each other to provide "material support or resources," as that term is defined in Title 18, United States Code, Section 2339A(b), to a foreign terrorist organization, namely, CJNG, which was designated by the U.S. Secretary of State as a foreign terrorist organization on or about February 20, 2025, pursuant to Section 219 of the Immigration

and Nationality Act ("INA"), and is currently designated as such as of the date of the filing of this Indictment.

26. It was a part and an object of the conspiracy that PAUL CAMPO and ROBERT SENSI, the defendants, and others known and unknown, would and did knowingly provide, and attempt to provide, CJNG with material support and resources, including property, services, expert advice or assistance, weapons, and explosives, knowing that CJNG was a designated foreign terrorist organization (as defined in Title 18, United States Code, Section 2339B(g)(6)), that CJNG engages and has engaged in terrorist activity (as defined in Section 212(a)(3)(B) of the INA), and that CJNG engages and has engaged in terrorism (as defined in Section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

## Overt Acts

27. In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

    a. On or about March 10, 2025, PAUL CAMPO and ROBERT SENSI, the defendants met with CS-1 in Manhattan, New York to discuss how CAMPO and SENSI could assist CJNG in moving money from the United States to Mexico.

    b. On or about July 16, 2025, after PAUL CAMPO and ROBERT SENSI, the defendants met at a restaurant in Manhattan, New York, during which they discussed, in substance and in part, laundering narcotics proceeds for CJNG, specifically $12,000,000.

    c. On or about October 16, 2025, CS-1 met with ROBERT SENSI, the defendant, in Manhattan, New York and delivered $250,000 to be converted into cryptocurrency to facilitate a purchase of over 220 kilograms of cocaine in the United States.

(Title 18, United States Code, Section 2339B(a)(1).)

## COUNT FOUR
### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

28. The allegations contained in paragraphs 1 through 27 of this Indictment are repeated and realleged as if fully set forth herein.

29. From at least in or about December 2024 through at least in or about November 2025, in the Southern District of New York and elsewhere, PAUL CAMPO and ROBERT SENSI, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit money laundering, in violation of Title 18, United States Code, Sections 1956(a)(3)(A) and (B).

30. It was a part and an object of the conspiracy that PAUL CAMPO and ROBERT SENSI, the defendants, and others known and unknown, with the intent to promote the carrying on of specified unlawful activity, to wit, narcotics trafficking, in violation of Title 21, United States Code, Section 841, would and did conduct and attempt to conduct a financial transaction, which transaction affected interstate and foreign commerce and involved the use of a financial institution which was engaged in, and the activities of which affected, interstate and foreign commerce, involving property represented to be the proceeds of specified unlawful activity, to wit, the proceeds of narcotics trafficking, in violation of Title 21, United States Code, Section 841, in violation of Title 18, United States Code, Section 1956(a)(3)(A).

31. It was further a part and an object of the conspiracy that PAUL CAMPO and ROBERT SENSI, the defendants, and others known and unknown, with the intent to conceal and disguise the nature, location, source, ownership, and control of property believed to be the proceeds of specified unlawful activity, to wit, narcotics trafficking, in violation of Title 21, United

States Code, Section 841, would and did conduct and attempt to conduct a financial transaction, which transaction affected interstate and foreign commerce and involved the use of a financial institution which was engaged in, and the activities of which affected, interstate and foreign commerce, involving property represented to be the proceeds of specified unlawful activity, to wit, the proceeds of narcotics trafficking, in violation of Title 21, United States Code, Section 841, in violation of Title 18, United States Code, Section 1956(a)(3)(B).

(Title 18, United States Code, Section 1956(h).)

## FORFEITURE ALLEGATIONS

32. As a result of committing the offense alleged in Counts One and Three of this Indictment, PAUL CAMPO and ROBERT SENSI, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 981(a)(1)(G) and Title 28, United States Code, Section 2461(c), any and all property, real or personal, which constitutes or is derived from proceeds traceable to the commission of said offense; any and all assets, foreign and domestic, of the defendants; any and all assets, foreign and domestic, affording the defendants a source of influence over any entity or organization engaged in planning or perpetrating said offenses; any and all assets, foreign and domestic, acquired or maintained with the intent and for the purpose of supporting, planning, conducting or concealing said offenses; any and all assets, foreign and domestic, derived from, involved in, or used or intended to be used to commit said offenses, including but not limited to a sum of money in United States currency representing the total amount of proceeds traceable to the commission of the offense and the defendant's assets.

33. As a result of committing the offense alleged in Count Two of this Indictment, PAUL CAMPO and ROBERT SENSI, the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Section 853, any and all property constituting, or derived from,

any proceeds obtained, directly or indirectly, as a result of said offense and any and all property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

34. As a result of committing the offense alleged in Count Four of this Indictment, PAUL CAMPO and ROBERT SENSI, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense.

## Substitute Assets Provision

35. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the

defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
FOREPERSON

*Jay Clayton* (signature)
▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
JAY CLAYTON
United States Attorney