

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 5, 2026

**BY ECF AND EMAIL**

The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, NY 10007

Re:   *United States v. Robert Sensi*, 25 Cr. 663 (PGG)

Dear Judge Gardephe:

The Government respectfully writes in opposition to defendant Robert Sensi's motion for release from custody pending trial. The defendant was a critical member of a wide-ranging and lengthy scheme to assist a violent and powerful Mexican drug cartel, the Jalisco New Generation Cartel, a/k/a Cartel de Jalisco Nueva Generacion or CJNG ("CJNG"), which is a designated Foreign Terrorist Organization ("FTO"). Without regard for the implications of his actions, the defendant drew upon a vast network of international resources to launder large amounts of money for a confidential source the defendant believed to be a member of CJNG. The defendant and his co-conspirators further agreed to explore procuring commercial drones and military-grade weapons for CJNG from international sources and to facilitate and directly profit from a lucrative narcotics transaction. For his conduct, the defendant has been charged with narcoterrorism and narcotics conspiracies, in violation of 21 U.S.C. §§ 960a and 846, respectively; conspiracy to provide material support to a designated terrorist organization, in violation of 18 U.S.C. § 2339B; and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). As further detailed below, the defendant poses a severe danger to the community and a significant risk of flight, and accordingly, the Government respectfully requests that the Court continue to detain the defendant pending trial.

**I.      Applicable Law**

A defendant must be detained where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). In making this determination, the Court must consider:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence…a Federal crime of terrorism, or involves a…controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

January 5, 2026
Page 2 of 9

(3) the history and characteristics of the person, including –

    (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

    (B) whether at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C § 3142(g).

Where, as here, there is probable cause to believe that the defendant committed an offense under the Controlled Substances Act for which the maximum term of imprisonment is ten years or more, subject to rebuttal by the defendant, "it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of [a defendant] as required and the safety of the community." 18 U.S.C § 3142(e)(3)(A). This presumption also applies where, as here, there is probable cause to believe that the defendant committed offenses related to the provision of material support to terrorist organizations and narco-terrorism. 18 U.S.C § 3142(e)(3)(C). The presumption of remand "reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). The defendant "bears a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011). "[A] defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption." *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991). Even when a defendant "has met his burden of production" to rebut the presumption favoring detention, that presumption "does not disappear entirely, but remains a factor to be considered among those weighed by the district court." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

"At all times, however, 'the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community,' and 'by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight.'" *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (quoting *Mercedes*, 254 F.3d at 436). For purposes of the bail statute, the concept of dangerousness includes "the danger that the defendant might engage in criminal activity to the detriment of the community." *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993).

## II. The Defendant Poses a Severe Danger to the Community

The conduct with which the defendant is charged is incredibly serious and demonstrates by clear and convincing evidence that the defendant would endanger the community if released, especially when the Court considers that this is a "presumption" case.

### A. Nature and Circumstances of the Charged Conduct

As further detailed in the Government's indictment, beginning in December 2024, over a series of initial meetings and conversations, Robert Sensi met with a confidential source posing as a member of CJNG ("CS-1"). (Dkt. 2 ("Indictment" or "Ind.") ¶ 6). Sensi told CS-1, in substance and in part, that his friend—Paul Campo—used to oversee financial operations for the Drug Enforcement Administration ("DEA") and still had connections to DEA, including its top leadership. (*Id.*). Sensi explained, in substance and in part, that Campo could launder narcotics proceeds and provide sensitive DEA information about sources and investigations into CJNG. (*Id.*).

After these initial meetings with Sensi, CS-1 met with Sensi and Campo multiple times, including at least twice in New York City and once in Tampa, Florida. (Ind. ¶ 7). During these conversations, Sensi, Campo, and CS-1 discussed CJNG's operations across the United States and the fact that CJNG needed a reliable method of moving narcotics proceeds from the United States to Mexico. (Ind. ¶ 9). Sensi and Campo agreed to launder money for CJNG for a fee by, among other things, converting cash into cryptocurrency and making investments in real estate. (Ind. ¶ 7). In total, they agreed to launder at least $12 million. (Ind. ¶ 8). Indeed, Sensi, Campo, and their co-conspirators laundered $750,000, by converting cash into cryptocurrency and, less their fee, returning it to CS-1 or others. This occurred over the course of three money drops, each of several hundred thousand dollars. (Ind. ¶¶ 9-17). Each time, Sensi met with CS-1 and retrieved the money. (*Id.*). Then, several days later, Sensi, Campo, and their co-conspirators sent cryptocurrency to a wallet that CS-1 represented belonged to CJNG, but which was really controlled by DEA. (*Id.*). Additionally, for at least the first money pickup, Sensi sent CS-1 screenshots of the cryptocurrency transfers being initiated. (Ind. ¶ 11). For each of the first two money drops, Sensi traveled to Charlotte, North Carolina to pick up the money. For the third money drop, Sensi traveled to New York City to meet CS-1.

Additionally, in connection with the third money drop, Sensi and Campo agreed to participate in a narcotics conspiracy for the benefit of CJNG. (Ind. ¶ 8). Specifically, at a meeting in Boca Raton, Florida on October 1, 2025, CS-1 told Sensi, in substance and in part, that a shipment of over 220 kilograms of cocaine was coming to the United States and CS-1 wanted to purchase the narcotics and resell them. (Ind. ¶ 16). CS-1 asked Sensi and Campo to convert $250,000 into cryptocurrency and deliver it to a wallet belonging to the owner of the cocaine, who would then release the shipment to CS-1. (*Id.*). At that point, CS-1 would sell the narcotics for approximately $5,000,000. (*Id.*). As compensation, Sensi and Campo would receive a ten percent laundering fee and thirty percent of the proceeds from the sale of the drugs. (*Id.*). The rest of the narcotics proceeds would be given to Sensi and Campo to invest in other opportunities for CJNG. (*Id.*). Sensi readily agreed to CS-1's proposal and then called Campo

January 5, 2026
Page 4 of 9

with CS-1 to relay the same to Campo. (*Id.*). Campo agreed and approximately two weeks later, Sensi collected $250,000 from CS-1 in New York, which he and Campo then converted into cryptocurrency that was sent to an undercover wallet represented to belong to the owner of the cocaine.[1] (Ind. ¶ 17). On the day of their arrests, December 4, Sensi and Campo traveled to New York to meet with CS-1 to collect their cut of the proceeds from the cocaine deal.

Finally, in addition to believing that CS-1 was a high-level member of CJNG, Sensi and Campo were aware that CJNG engages in terrorist activities, including because they agreed to procure weapons for CS-1, such as AR-15 semi-automatic rifles, M4 carbines, M16 rifles, grenade launchers, and rocket propelled grenades. (Ind. ¶ 7). As part of this effort, Sensi introduced CS-1 to a member of another FTO based in Colombia, from whom Sensi indicated CS-1 could source C-4 explosives. Sensi attempted to set up an international meeting between CS-1 and this FTO member. Sensi also sent CS-1 images and videos of weapons and shipping containers that Sensi told CS-1 were in Brazil and ready to be purchased. Sensi even sent CS-1 invoices for such weapons. Below are several examples of messages between Sensi and CS-1 reflecting these discussions.





Sensi and Campo also agreed to procure drones that CS-1 indicated to them would be outfitted with explosives for CJNG to use in Mexico. (Ind. ¶ 7). As part of discussions

---

[1] This $250,000 is included in the $750,000 that Sensi and Campo laundered for CS-1.

regarding the drones, CS-1 explained to Campo and Sensi, "what we do with the drones, we put explosives and we just send it over there, boom." (*Id.*). In another conversation, CS-1 asked Sensi how much C-4 explosive the drones could carry, to which Sensi responded, in sum and substance, approximately six kilograms, which is enough to "blow up the whole fucking . . . I don't want to say." (*Id.*).

It is difficult to overstate the seriousness of Sensi's conduct. Sensi had little to no regard for the consequences of his actions—he believed he was laundering money, participating in narcotics trafficking, and procuring weapons and explosives for a violent cartel. And he was integral to the scheme. Sensi and Campo were equal partners. Sensi introduced CS-1 to Campo and was part of nearly every conversation between Campo and CS-1. Sensi was also responsible for traveling to meet with CS-1 to pick up the money to be laundered and was directly involved in converting and sending the funds back to CS-1. As described above, he also eagerly pursued the narcotics deal and weapons deal with CS-1. Notwithstanding Sensi's assertions that he does not own any weapons and has never committed a violent offense, his conduct in this case highlights his access to weapons and intentions otherwise.

Put simply, Sensi's behavior demonstrates a deeply concerning willingness to engage in significant criminal conduct. Sensi is a clear and present danger to the community and should be detained on that basis alone.

### B. The Weight of the Evidence

The evidence against the defendant is overwhelming and includes, among other things, (1) hours of recordings of meetings and phone calls with CS-1, (2) financial statements and cryptocurrency records showing the movement of laundered funds, (3) electronic evidence, including the defendant's communications with Campo and his other co-conspirators, and photographs of weapons and invoices that the defendant sent to CS-1; and (4) witness testimony.

### III. Risk of Flight

The potential penalties that the defendant is facing, combined with his significant international ties and access to capital, more than satisfy the Government's lesser burden to establish risk of flight.

The defendant is facing a substantial prison sentence, including a mandatory-minimum sentence of 20 years imprisonment. Given the nature of the crime—narcoterrorism—he is not safety valve eligible. In all likelihood, if convicted, he will spend a significant portion, if not all, of his life in prison. Courts in this Circuit have determined that substantial prison terms provide a significant incentive to flee or fail to appear in court. *See United States v. Scali*, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that [defendant's] Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee."); *United States v. Madoff*, 316 F. App'x 58, 59 (2d Cir. 2008) (finding that the district court was correct to find that defendant was a flight risk based on lengthy prison sentence and age, combined with "the means—and therefore the ability" to flee, even when those means were denied by defendant.").

Moreover, here, the defendant has demonstrated access to funds and contacts abroad that would facilitate his flight. First, the defendant has several close family members with substantial international connections, including his wife and son, who have longstanding ties to and are currently located in Colombia and Bolivia, respectively.[2] Second, the defendant's efforts to launder money and set up a weapons deal as part of this case, underscore his deep ties abroad. As described above, the defendant represented to CS-1 that he was sourcing weapons and explosives from South America, including through a member of a Colombian FTO. Additionally, the Government has traced at least some of the laundered cryptocurrency that was received by CS-1 to cryptocurrency wallets owned by individuals in South America. To carry out this scheme, the defendant relied on international contacts with large amounts of money that could also provide him with resources to flee.

### IV. The Defendant's Medical Conditions and the Conditions in Custody

The defendant argues for his release primarily because of his age and medical conditions, which, he contends, diminish his dangerousness and risk of flight.[3] Notwithstanding the defendant's assertion, he traveled extensively over the course of the charged scheme, including

---

[2] Notwithstanding the defendant's assertion that if released, he will live with his wife, Paola Ruiz Sosa, and son, Stefano Sensi, at an apartment in Florida, the Government's understanding is that the defendant's wife remains outside the country.

[3] The defendant also cites the December 5, 2025 report from the Pretrial Services Office ("Pretrial") that recommends that the defendant be released on conditions. The Court should give limited weight to Pretrial's recommendation, because it is based on incomplete information. Pretrial's recommendation does not consider several of the factors that weigh most heavily in favor of detention. Nor does the recommendation consider all the factors mandated by the Bail Reform Act. Specifically, Pretrial <u>does not consider</u>, in any way:

1. The underlying facts or circumstances of the charged offense conduct, including any information that could be proffered by the Government or case agent, or even the details alleged in the Indictment's "to wit" clause, regardless of that information's reliability. *See* 18 U.S.C. § 3142(g)(1), (4).

2. The weight of the evidence, even if it is clear from the face of the charging document or undisputed. *See* 18 U.S.C. § 3142(g)(2).

3. The potential penalties the defendant faces if convicted, even when they create an incentive for the defendant to flee or otherwise not to appear for future court proceedings.

4. The statutory presumption that no condition or combination of conditions will reasonably assure the defendant's appearance or the safety of the community. *See* 18 U.S.C. § 3142(e)(3).

several times to New York by plane and several times from his home in Florida to North Carolina and back by car to pick up proceeds to launder. The defendant's conduct in this scheme belies any notion that his medical conditions render him incapable of flight or causing harm. Indeed, as described above, just one month ago, on the date of his arrest, the defendant flew from Florida to New York to pick up what he believed to be millions of dollars of narcotics proceeds.

In his bail application, the defendant also argues that he has "deteriorated rapidly" while incarcerated at the Metropolitan Detention Center ("MDC"), resulting in his transfer to ███████ ███████████████████████████████. However, there is nothing in the defendant's medical records from the Bureau of Prisons ("BOP") that suggests that he has "deteriorated rapidly" since his intake at the MDC. *See* Ex. A, BOP Medical Records. On December 6, 2025, a health screening was administered, at which the defendant informed clinicians of the following pre-existing diagnoses: ████████████████████████████████████████████████████████████████. Subsequently, a nurse contacted the pharmacy where the defendant filled his prescriptions prior to incarceration to ensure continuity of care.[4] The nurse also ███████████ and scheduled the defendant for a follow-up appointment with an ███████████████████. On December 22, the defendant was seen by a nurse practitioner for ███████████, where he disclosed an additional diagnosis of ███████████, specifically a ████████████████████████████████.[5] On December 23, Dr. Bruce Bialor, Clinical Director at the MDC, evaluated the defendant and recommended that he be transferred to ████████, not because his condition had worsened, but as a precaution given the defendant's age, ███████ and comorbidities. The Government's understanding is that the MDC's clinicians have determined that the defendant is both clinically stable and able to perform daily activities. He is taking several medications and requires ████████████████████████████████████████████████.[6] The Government understands that this treatment and monitoring can be done at the MDC, but the MDC's clinicians determined that the defendant should be transferred in an abundance of caution.

---

[4] The defendant claims that he has not received his ███████████ medication since arriving at the MDC. The Government has conferred with MDC staff and understands that the defendant's ███████████ medication required BOP regional approval, which was received ███████████ However, the defendant was transferred to ████████ prior to this medication being dispensed.

[5] While the defendant claims that he did not receive his ████████ medication at the MDC, as described above, upon his admittance to the MDC, the defendant's active prescriptions were verified with his pharmacy. The Government understands that the defendant had not been prescribed any ████████ medication at the time.

[6] The defendant claims that since being detained, he has not been able to monitor his ████████ However, according to the MDC's clinicians, the defendant's ████████ does not require ████████████████████ because the defendant is ████████████. Instead, he requires ████████, which measures ████████████████████████ over a three-month period. Prior to his transfer to ████████, the defendant was scheduled for ████████ in early January.

January 5, 2026
Page 8 of 9

▮▮▮ is a community hospital with an array of traditional inpatient services. ▮▮▮ currently houses several inmates who were previously at the MDC. The Government understands that the defendant's prescriptions and treatment protocols have been transferred to ▮▮▮ which can meet all of the defendant's medical needs, including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The defendant's medical professionals at ▮▮▮ will monitor his health, conduct lab work and provide all necessary treatment. At this time, MDC personnel anticipate the defendant remaining at ▮▮▮ for the foreseeable future, because the reasons for his transfer to ▮▮▮ are unlikely to change significantly.

The defendant also takes issue with his restraints at the hospital. The Government understands that the U.S. Marshals Service is responsible for the security protocols applicable to the defendant at ▮▮▮. Per their policy, restraints are required for safety, but removal is authorized if deemed medically necessary (e.g., surgery or to permit detainees to conduct physical, occupational, and other therapy).

Ultimately, the defendant's transfer to ▮▮▮ does not "confirm[] that the BOP is ill-equipped" to care for Sensi, but rather that the system is working as intended and Sensi is receiving the necessary care while incarcerated.

Finally, should the defendant return to the MDC, he raises concerns with the conditions of confinement at the MDC, which he characterizes as "horrific." The defendant's complaints, however, are generalized and not specific to him. In his submission, the defendant broadly cites the opinions of various courts that, for example, describe "overcrowding, staffing issues, and lockdowns at the MDC" and describe the MDC as "dreadful," "dirty," "infested with drugs," and "plagued by violence." Notably, all the cases cited by the defendant are over a year old. The facts are that the MDC has greatly improved staffing since early 2024 and, as of September 2025, was staffed at 87%.[7] As of August 2025, the MDC's correctional services department was staffed at 94% and the facility's health services department was staffed at 85%.[8] The increase in staffing has been accompanied by fewer inmates, which has contributed to a substantial decrease in violence. Additionally, the MDC has implemented telehealth, providing inmates with increased access to cardiology, dermatology, and gastrointestinal specialists, physical and occupational therapists, and the BOP's opioid treatment program.[9] And several judges in this District have recognized the marked improvements at the MDC. *See United States v. Sandy Carazas-Pinez*, 23 Cr. 346 (JPC) (Sept. 19, 2025 sentencing); *United States v. Clinton McCullum*, 24 Cr. 667 (JPC) (Aug. 29, 2025 sentencing); *United States v. Jean Carlos Burgos*, 24 Cr. 650 (LTS) (May 21, 2025 plea); *United States v. Kevin Reshard*, 24 Cr. 392 (JMF) (May 14, 2025 sentencing); *United States v. Alon Alexander et al.*, 24 Cr. 676 (VEC) (Jan. 16, 2025 bail argument). At bottom, the defendant's generalized complaints about the MDC's conditions of confinement do not support his release

---

[7] *See* Metropolitan Detention Center Brooklyn - Fact Sheet as of September 2025, BOP, https://www.bop.gov/resources/pdfs/mdc_bro_des_fact_sheet_sep_2025.pdf (last visited January 5, 2026).
[8] *See id.*
[9] *See id.*

January 5, 2026
Page 9 of 9

pending trial.

\*   \*   \*

  For all of the reasons stated above, the defendant is unable to overcome the presumption that no condition or combination of conditions will reasonably assure the safety of the community or his appearance in court if released pending trial. The Government therefore respectfully requests that the defendant remain detained pending trial.

            Respectfully submitted,

            JAY CLAYTON
            United States Attorney

        By:  /s/
            Varun A. Gumaste
            Assistant United States Attorney
            Tel: (212) 637-1023

Cc: Counsel of Record (by ECF)

# EXHIBIT A